WRIGHT, J.,
CONCURRING IN PART AND DISSENTING IN PART:
While I concur with the majority insofar as it affirms the Court of Appeals’ holding regarding the Philadelphia Indemnity Insurance policy, I respectfully dissent as to the Encompass Indemnity Company policy-
Ultimately, my view boils down to a simple premise: a reasonably prudent per-sbn purchasing insurance should not have to wrestle to divine the meaning of overly technical, vague, and legalistic terms; nor should he have to flip between unclear policy provisions to ascertain what his policy covers. Society benefits from contracts—from people fulfilling their promises. I would hold the exclusion unenforceable for two reasons. First, it would force insurance companies to find a way to clearly and unmistakably state what a plan covers and what it does not. Second, it would level the playing field so that a reasonably prudent purchaser of insurance would be capable of understanding the terms and provisions of a policy. This would go a long way in ensuring that consumers get what they bargain for.
The majority indicates that all Tryon had to do was to read his policy to know whether he was covered. I disagree. We cannot hold the average person to the same standard as we hold ourselves. We cannot forget that we have gone to school, practiced law (some of us in the very area of insurance law), sat on the benches of various courts in this Commonwealth and risen to the Supreme Court of Kentucky. We simply cannot expect the average person to have the same level of understanding we do when reading these contracts.
Even if the majority believes that an average person would understand this insurance policy, it is fatally easy to overestimate the average person’s ability to understand legal concepts, language, and construction of contracts. It can be extremely difficult to set aside all of our background, education, and experience to determine what would be clear and easily understood by an average person. The typical consumer of insurance is unaccustomed to referencing various sections and subsections in order to ferret out the meaning of a term. Yet, the majority implies he should easily be able to do just that in order to know what is covered and what is not.
*595 What is the reading level of the average adult? The Literacy Project Foundation’s published statistics show that fifty percent of adults cannot read a book written at an eighth-grade level. (http;//literacyproject foundation.org/community/statistics). According to the Clear Language Group “[t]he average reading level of American adults is about seventh to eighth grade level.” (http://www.clearlanguagegroup. com/readability). The Clear Language Group goes on to clarify that even though readability scores are given as a “grade level,” that does not mean that an individual who has completed that grade level will understand the text. Id. There are many factors that affect understanding and the grade level.is merely a determination if you are in the right “ballpark.”
I used an online software tool (found at http://www.onhne-utility.org/english/ readability_test_ancl_improve.jsp) to calculate readability by typing in the ninety-eight words that were the passages that the majority relied on in determining that Appellant was not covered under these circumstances. The actual document would have been much more difficult than the analysis showed, because of such factors as: the length of the entire document (one-hundred-thirteen pages); the fact that the document was written with many subsections; and the need to reference various sections in order to understand any particular phrase. The analysis determined that, according to the Gunning Fog Index, a person would need 13.96 years of formal education to understand the text on the first reading. The approximate representation of the U.S. grade level needed to comprehend the limited text that was analyzed was:
Flesch Kincaid Grade leveí. 12.88
ARI (Automated Readability Index) 10.05
SMOG 15.00
This one-hundred-thirteen-page document would be much more difficult for the average American to read and understand than the majority believes.
This is further complicated by the way in which most insurance policies are sold. The person fills' out an application’ and submits it to the insurance company along with payment. The insurance company decides if it will insure the individual. If accepted, the individual is then mailed the insurance policy. (We do not know if these were the actual steps in this case because evidence was not taken on this issue.) The purchaser of the insurance is then left with the task of reading, understanding, and determining what his insurance coverage is and the dangers of all the exceptions. The purchaser then would have to. determine whether to renegotiate any problem areas, purchase additional insurance, or begin searching for a new insurance policy. An average American could easily be overwhelmed with the task.
Furthermore, the majority deviates from nearly seventy years of precedent in this Court’s construction of insurance policies. In 1950, our predecessor Court stated, “[a] policy or contract of insurance ordinarily is to be construed liberally in favor of the insured and strictly as against the insurer.” Koch v. Ocean Acc. & Guar. Corp., 313 Ky. 220, 224, 230 S.W.2d 893, 895 (1950). Likewise, for nearly a half century, this Court has held, “exceptions and exclusions [of insurance policies] should be strictly construed so as to make insurance *596 effective.” State Auto. Mut. Ins. Co. v. Trautwein, 414 S.W.2d 587, 589 (Ky. 1967). In fact, we have said, “as to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured.” Eyler v. Nationwide Mut. Fire Ins. Co., 824 S.W.2d 855, 859 (Ky. 1992)(citing Koch v. Ocean Accident & Guaranty Corp., 313 Ky. 220, 230 S.W.2d 893 (1950); Webb v. Kentucky Farm Bureau Ins. Co., 577 S.W.2d 17 (1978)). While these long-held tenets of our law are firmly established, I also agree that, “[t]he rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it... [because] the policy must receive a reasonable interpretation consistent ... [with] the plain meaning and/or language of the contract.” St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223, 226 (Ky. 1994).
In Bidwell v. Shelter Mut. Ins. Co., 367 S.W.3d 585, 588 (Ky. 2012), this Court unanimously held:
[t]o be enforceable, Kentucky law requires a limitation of insurance coverage, such as a permissive user step-down provision, to be ‘clearly stated in order to apprise the insured of such limitations.’ St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223, 227 (Ky. 1994). [N]ot only is the exclusion to be carefully, expressed, but... the operative terms clearly defined. Id.
(Emphasis added.) The majority’s opinion alters this Court’s precedent by holding that owned-but-not-scheduled exclusions of underinsured motorist insurance policies are enforceable as long as they “expressly apprise insureds of the exclusion,” without the additional requirement that the operative terms be clearly defined. I believe the Court should not break with its precedent and should, instead, continue to require the policy to clearly define its operative terms.
In its exclusions, Encompass lists losses the company does not cover. Specifically, the policy states:
[w]e do not provide Underinsured Motorists Coverage for bodily injury sustained by any covered person ... [w]hile that covered person is operating or occupying a motor vehicle owned by, leased by, furnished to, or available for the regular use of a covered person if the motor vehicle is not specifically identified in this policy under which a claim is made.
Encompass’s policy also defines the operative term “covered person” as “[y]ou for the ownership, maintenance or use of any vehicle, except while occupying, or when struck by, a vehicle owned by you which is not insured for this coverage under this policy.” We will examine these policy provisions in turn.
First, the policy fails to define a phrase used in its exclusions. It is unclear what constitutes a “motor vehicle ... not specifically identified in this policy under which a claim is made.” This term could potentially mean motor vehicles covered under the policy. However, that is not the only possible meaning. “Identified” could also mean a vehicle “excluded by endorsement,” as contemplated elsewhere in the policy—as that vehicle would be “identified” by policy documents.
Just like the exclusion provision in Bid-well, Encompass’s policy exclusion, “leaves the policyholder guessing as to this provision’s meaning.” Bidwell, 367 S.W.3d at 590-91. “And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used. Wolford v. Wolford, 662 S.W.2d 835 (Ky. 1984).” Eyler, 824 S.W.2d *597 at 859-60. Thus, “when ambiguities exist, we resolve them against the drafter ‘in order to circumvent the technical, legalistic and complex contractual terms which limit benefits to the insured.’ Simon v. Cont’l Ins. Co., 724 S.W.2d 210, 213 (Ky. 1986) (quoting R.H. Long, The Law of Liability Insurance, § 5.10B).” Bidwell, 367 S.W.3d at 588-89.
The majority holds that owned-but-not-scheduled exclusionary provisions are enforceable “so long as they expressly apprise insureds of the exclusion.” And the majority concludes that the Encompass exclusion meets that standard. I disagree. In order for the apprised to be express, the provision must be “[cjlearly and unmistakably communicated; [or] stated with directness and clarity.” EXPRESS, Black’s Law Dictionary (10th ed. 2014). Encompass failed to unmistakably communicate the parameters of the exclusion. As this Court unanimously said:
“An essential tool in deciding whether an insurance policy is ambiguous, and consequently should be interpreted in favor of the insured, is the so-called ‘doctrine of reasonable expectations.’” [Simon v. Continental Ins. Co., 724 S.W.2d 210, 212 (Ky. 1986).] We explained in Simon that “[t]he gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect. to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company’s intent to exclude coverage will defeat that expectation.” Id. (internal citation and quotation marks omitted).
Bidwell, 367 S.W.3d at 589 (Ky. 2012).
Furthermore, the majority uses the policy’s definition of “covered person” to support its claim that “the policy is in fact a clear and unambiguous statement that , the policy does not pay benefits for vehicles it does not insure.” However, this is a misstatement of the material terms of the policy.
The definition of covered person reads “[y]ou for the ownership, maintenance or use of any vehicle .... ”[34] (Emphasis added.) Thus, contrary to the majority’s contention, the policy covers virtually any vehicle used by the insured. The sole exception under the definition of “covered person” is for those vehicles owned by the insured but not covered under this policy.[35] Therefore, had Tryon been riding his friend’s motorcycle when he experienced an underinsured loss (assuming that motorcycle was not available for his regular use, pursuant to the policy’s exclusionary provisions), Encompass would pay underinsured motorists benefits to him, irrespective of the liability insurance carrier for his friend’s motorcycle. As this hypothetical illustrates, it is clear that the policy does, in fact, pay benefits for vehicles it does not insure. Therefore, the majority’s statement that “the policy is in fact a clear and unambiguous statement that the policy does not pay benefits for vehicles it does not insure,” is simply incorrect.
*598 Finally, I point out that the policy does not use the language “except .., a vehicle owned by you which is not insured under this policy” when describing the “Underinsured Motorists Losses We Do Not Cover,” but rather, only when defining “covered person.”- That begs the question: which is it? Does the exclusion mean any vehicle owned by the insured but not covered by Encompass? Or, does the exclusion apply to motor vehicles not “identified” under this policy? This key difference between policy terms creates further ambiguity. Whether the ambiguity arises from structural issues or whether it is a result of inconsistent or confusing language, courts should interpret the ambiguous terms in favor of the insured and in favor of insurance coverage—-just as courts of this Commonwealth have done for more than a half century.
It is for these reasons that I dissent and would affirm the Court of Appeals.
Noble and Venters, JJ., join.

. The syntax of the phrase “you for the ownership, maintenance or use” frankly puzzles me and further supports my contention thát the language throughout the policy relating to underinsured motorists coverage is, indeed, ambiguous.

. If one applies the language from the un-derinsured motorists exclusion instead of the definition of covered person, the corpus of what the policy excludes potentially changes. Instead of whether the vehicle is covered under this policy, the determinative factor is whether a vehicle owned by the insured is specifically identified in the policy—further evidence of the plan's ambiguity relating to underinsured motorists coverage.